UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MICHAEL HAMEL,

                    Plaintiff,                   **AMENDED COMPLAINT**

    -against-                           CV-15-6324 (RRM) (RER)

CITY OF NEW YORK, COMMISSIONER JOSEPH     **JURY TRIAL DEMANDED**
PONTE, DEPUTY WARDEN OF ADMINISTRATION
PENNYE L. JONES, and CAPTAIN ALVIN SLEDGE,

                 Defendants.
-------------------------------------------------------------------X

      Plaintiff, MICHAEL HAMEL by and through his attorneys FAMIGHETTI & WEINICK,

P.L.L.C., complaining of the Defendants, CITY OF NEW YORK, COMMISSIONER OF

CORRECTIONS, JOSEPH PONTE, DEPUTY WARDEN OF ADMINISTRATION, PENNYE

L. JONES, and CAPTAIN, ALVIN SLEDGE, (collectively "Defendants"), alleges upon

knowledge as to himself and his own actions and upon information and belief as to all other

matters, as follows:

<u>**NATURE OF THE CASE**</u>

    1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 for violations of

Plaintiff's rights, privileges and immunities secured by the First Amendment to the United States

Constitution and Article I §§ 6, 8, and 11 of the Constitution of the State of New York.

    2.      This action is also brought pursuant to Americans with Disabilities Act, 42 U.S.C.

§ 12101 *et seq*. ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, the

New York State Human Rights Law, Executive Law Sections 290 *et seq.,* ("NYSHRL"), the

New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York

1

*et seq.,* ("NYCHRL"), the New York City Charter §§ 621, 622, 815(f) and 1101, the Rules of the City of New York; 55 RCNY Appendix A Rule I; §§ 2.1(c); 5.2.7(a), (c), and any other cause(s) of action that can be inferred from the facts set forth herein.

## JURISDICTION AND VENUE

3.      Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.  Supplemental jurisdiction is invoked over state and local causes of action pursuant to 28 U.S.C. § 1367.

4.      Venue is appropriate in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

5.      On October 10, 2014, Hamel filed a notice of claim with City of New York.

6.      On December 10, 2014, NYC held a 50-h hearing.

7.      Defendants have failed or refused to make adjustments on the claims presented in the notice of claim.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      Plaintiff filed a complaint with the New York State Division of Human Rights ("DHR") on December 26, 2014, which was cross filed with the Equal Employment Opportunity Commission ("EEOC") on December 31, 2014.

9.     On August 11, 2015, the EEOC issued to Plaintiff a Dismissal and Notice of Rights to Sue letter.

10.     Plaintiff filed the original Complaint in the Eastern District of New York on November 4, 2015.

11.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

12.     At all relevant times, Plaintiff, Michael Hamel ("Plaintiff" or "Hamel"), was employed by the City of New York, Department of Corrections as a probationary corrections officer and was a resident of Suffolk County, New York.

13.     Defendant, City of New York, ("NYC"), is a municipal corporation with its principal place of business in New York County, New York.  NYC has the responsibility for hiring and training within the Department of Corrections ("DOC") and setting and executing the policies of the DOC.

14.     The DOC is an administrative agency of NYC.

15.     Defendant, Joseph Ponte ("Ponte"), at all relevant times was employed by NYC as the Commissioner of the DOC.  Ponte is responsible for the DOC's maintenance and operation, including, but not limited to, employment related issues.  Additionally, Defendant Ponte is a policymaker for the DOC, responsible with the final decision making authority with

respect to insuring that employees are not subjected to discrimination, retaliation or harassment. He is also responsible for properly training and supervising employees with respect to employment issues.

16.     Defendant, Pennye L. Jones ("Jones"), at all relevant times was employed by NYC as the Deputy Warden of Administration of the DOC.  Jones is responsible for the DOC's maintenance and operation, including, but not limited to, employment related issues.  She was also responsible for properly training and supervising employees with respect to employment issues.

17.     Defendant, Captain Alvin Sledge ("Sledge"), at all relevant times was employed by NYC as a Captain with the DOC.  Sledge is responsible for properly training and supervising employees with respect to employment issues.

## **FACTUAL BACKGROUND**

18.     Hamel is a male diagnosed with medical conditions, including, Sarcoidosis, Bronchiolitis obliterans with organizing pneumonia (BOOP).

19.     The sarcoidosis and BOOP cause Hamel to have a persistent dry cough, fatigue, and shortness of breath, which affects his ability to perform the major life function of breathing, but which did not otherwise affect his ability to perform his job responsibilities as a probationary corrections officer.

20.     In February 2013, Hamel reported to the DOC medical unit for a medical evaluation as part of the application process for employment with the DOC.

21.     Patrick Figorito, a registered nurse for the DOC's medical unit, placed Hamel on medical review to recheck his vision and to receive clearance from a pulmonologist, a thoracic surgeon and cardiologist.

22.     In February 2013, Hamel was medically cleared to work as a corrections officer by a pulmonologist, and thoracic surgeon both of whom issued medical reports finding that Hamel was medically fit to perform the functions of corrections officer.

23.     In April 2013, Hamel was medically cleared by a cardiologist, who issued a medical report finding Hamel medically fit to perform the functions of corrections officer.

24.     In other words, notwithstanding his disability, Hamel was qualified for the position of corrections officer.

25.     Hamel provided and the DOC accepted the medical reports.

26.     On April 23, 2014, the DOC offered, and Hamel accepted the DOC's offer of employment for the position of corrections officer.

27.     On May 16, 2013, Hamel began orientation at the City of New York, Corrections Academy, and was assigned to work at the Otis Bantum Correctional Center ("OBCC") at Rikers Island.

28.     On or about July 2, 2013, Hamel was treated at Brookhaven Memorial Hospital emergency room for shortness of breath, cough and congestion related to the sarcoidosis, and utilized two sick days to recover from these medical conditions.

29.     On October 7, 2013, Hamel utilized one sick day to treat the sarcoidosis.

30.     On October 16, 2013, Hamel was evaluated by his pulmonologist for the shortness of breath and cough because of the sarcoidosis, which caused his absence on October 7, 2013.

31.     On October 18, 2013, Jones issued Hamel a written warning for utilizing a sick day on October 7, 2013.

32.     Hamel advised Jones that the sick day was necessary as an accommodation to treat the sarcoidosis but Jones did not care nor did she ask for a reason or engage him in the interactive process.

33.     On November 8 and 9, 2013, Hamel utilized two sick days because of breathing complications associated to the sarcoidosis, and was treated by his primary care physician.

34.     Hamel returned to work on November 10, 2013 and provided the Health Management Division with a doctor's note indicating the reason why he was out of work and that he was able to return to work.

35.     On November 14, 2013, Jones issued Hamel a second written warning for utilizing sick days on November 8 and 9, 2014 to treat the sarcoidosis.

36.     Despite the fact that Hamel did not utilize anymore sick days between November 10, 2013 and November 21, 2014, on November 21, 2013, Jones issued Hamel a third written warning, entitled "Attendance Counseling".

37.     The November 21, 2013 warning threatened to classify Hamel as a chronic absentee.

38.     At the time Jones issued the warning, she knew about Hamel's medical conditions, including the sarcoidosis and his valid use of sick days to treat his conditions.

39.     Further, Jones did not discuss or explore with Hamel the possibility of other accommodations.

40.     As a result, of the third warning, the DOC could revoke or deny benefits and privileges afforded to Hamel, thus the warning effectively stripped from Hamel the employment benefit of security in his job benefits.

41.     On December 17 and 18, 2013, Hamel utilized two sick days because he was diagnosed with pneumonia related to the sarcoidosis.

42.     Hamel was seen by his treating physician and was provided with a doctor's note for his absences on December 17 and 18, 2013.

43.     Hamel returned to work on December 19, 2013.

44.     On December 19, 2013, Jones verbally warned Hamel that the absences are unacceptable, and again, threatened to label him chronic absent if the absences continued.

45.     Hamel advised Jones that the sick days were necessary to treat the pneumonia related to the sarcoidosis *i.e.,* Hamel had an infection of the small air sacks in his lungs, which caused him to have a fever, cough, fatigue and muscle aches.

46.     Again, Jones did not in any way engage in an interactive process with Hamel to discuss other accommodations.

47.     On January 4, 2014, Hamel was treated at Brookhaven Memorial Hospital for coughing and vomiting related to the sarcoidosis.

48.     On January 7, 2014, Hamel was treated at Suffolk Chest Physicians for a flare up of the sarcoidosis and cough variant asthma *i.e.,* dry cough, fatigue, and shortness of breath.  The doctor recommended that he remain out of work until January 16, 2014.

49.     On January 9, 2014, Hamel was evaluated by the DOC's doctor, Doctor Kwasnik who permitted him to remain out of work until a reevaluation on January 22, 2014.

50.     Hamel was reevaluated by Suffolk Chest Physicians on January 16, 2014, and was instructed to remain out of work until January 30, 2014.

51.     Hamel was reevaluated at Suffolk Chest Physicians on January 30, 2014 and was approved to return to work on February 2, 2014.

52.     On January 30, 2014, Hamel was seen by the DOC's health management division for evaluation and to submit doctor's notes to return to work on February 2, 2014.

53.     Hamel returned to full duty on February 2, 2014 with no restrictions.

54.     On February 17, 2014, Hamel was involved in a use of force incident at in the 8 upper B dormitory area, meaning that he had a physical encounter with two inmates who were fighting.

55.     While breaking up the fight between the two inmates, Hamel performed a wrist lock on one of the inmates, and while pivoting, to perform the maneuver, he felt a pop in his knee, which he later learned was a double torn meniscus.

56.     Hamel activated his personal body alarm numerous times to alert the probe team to respond to his housing area to assist him with the fighting inmates but the body alarm was apparently defective and the probe team did not immediately respond.

57.     The probe team only responded after Hamel called the control room for assistance.

58.     Captain Sledge who was on duty, arrived at the scene of the assault and escorted Hamel to the main clinic for evaluation and treatment of the knee.

59.     Captain Sledge responded to the assault in his capacity as a Captain within the DOC.

60.     DOC policy requires corrections officers to file reports concerning the use of force, as well as when they are injured in the line of duty.

61.     DOC policy requires Captain Sledge to file reports concerning the use of force by a subordinate.

62.     While escorting Hamel to the clinic, Captain Sledge ordered Hamel to state on the report that he hurt his knee getting up from a desk and not by breaking up a fight between inmates because then it will not be logged as a use of force against the DOC.

63.     At the time, the DOC was motivated to prevent corrections officers from reporting use of force incidents because the United States Attorney's Office for the Southern District of New York was actively investigating use of force at Rikers Island pursuant to the Civil Rights of Institutionalized Persons Act and Section 14141 of the Violent Crime Control and Law Enforcement Act of 1994.

64.     Captain Sledge further advised Hamel that the DOC frowns upon the use of force and, again ordered him to falsify the report about the incident.

65.     In other words, Captain Sledge ordered Hamel to submit a false report about the use of force incident, but Hamel refused.

66.     Because Hamel refused to falsify the incident report, Captain Sledge submitted a statement, which falsely stated that Hamel told him that he injured his ankle while running to the incident.

67.     Normally, Captain Sledge would not submit a statement for an incident of this nature, so, here, Sledge deviated from policy.

68.     On February 17, 2014, Hamel submitted the incident reports stating that he injured his right knee during a use of force while breaking up a fight between two inmates.

69.     At the clinic, the DOC, evaluated Hamel's knee and found right knee trauma, not ankle trauma and advised him to follow up with private MD.

70.     During the evaluation, Hamel stated that he injured his right knee while breaking up a fight between two inmates, which was recorded in the doctor's progress notes.

71.     On his way home from work on February 17, 2014, Captain Sledge called Hamel who, again, asked Hamel if he was injured during a use of force or not.  Hamel replied that he injured his knee breaking up a fight between Inmate Jameson and Inmate Moore.

72.     On February 18, 2014, Hamel sought treatment for his right knee injury at Brookhaven Memorial Hospital's emergency room.

73.     Hamel was instructed to remain out of work for one week, follow-up with an orthopedic and was advised to use an immobilizer, crutches and meds as directed.

74.     On February 27, 2014, Hamel was evaluated by the DOC's Health Management Division, was continued on the sick list, requiring him to report back for a revisit in one month, and required Hamel to be evaluated by the Brooklyn Premier Orthopedic Group.

75.     On March 19, 2014, Dr. Frank Watkins, an orthopedist from Brooklyn Premier Orthopedic Group examined Hamel.   Dr. Watkins diagnosed Hamel with a right knee derangement ACL tear, and required him to continue the use of crutches.  The condition affected Hamel's ability to, among other things, walk, run, lift, and bend.

76.     Dr. Watkins also found that Hamel's injury was directly related to the use of force incident from February 17, 2014, and advised Hamel to stay out of work for 3-6 months.

77.     On March 26, 2014, Hamel was evaluated by Doctor Kwasnik from the DOC's Health Management Division.  Hamel submitted medical documentation and MRI report from his March 19, 2014 evaluation with Dr. Watkins to Doctor Kwasnik, and was instructed to remain out of work and to return for another evaluation on April 9, 2014.

78.     On April 7, 2014 Hamel was evaluated by Dr. Raziniarsky a physician from Defendant DOC's Health Management Division.  The physician evaluated Hamel's right knee and found him to be 100% disabled, and instructed him to remain out of work for an additional one to two months.

79.     On April 9, 2014 Hamel was evaluated by Doctor Kwasnik and submitted medical documentation from his April 7, 2014 evaluation with the orthopedist, Dr. Raz Winiarsky from Brooklyn Premier Orthopedics.  Dr. Kwasnik requested that Hamel provide a more detailed report at his next reevaluation.

80.     On May 5, 2014, Dr. Winiarsky, reevaluated Hamel and instructed Hamel to remain out of work for 3-4 weeks because of the use of force injury to his right knee.

81.     Hamel submitted the Dr. Winiarsky's report to Dr. Kwasnik during his May 7, 2015 reevaluation.

82.     Dr. Winiarsky's diagnosed him with a "right knee meniscal tear, internal derangement."   The condition affected Hamel's ability to walk, bend, lift, and sit for long periods.

83.     Dr. Kwasnik agreed with the Dr. Winiarsky's assessment and requested that Hamel return for another evaluation on May 28, 2014.

84.     On May 19, 2014 Hamel was evaluated by the DOC's Health Management Division, which permitted him to return to work effective May 21, 2014.

85.     On or about May 21, 2014, the DOC placed Hamel on medical monitor review, in other words, Hamel was to return to work but was to have no inmate supervision, no lifting, no squatting, and no excessive walking i.e., light duty.

86.     Indeed, the DOC provides light duty assignments for employees who are injured and unable to work full duty because of the injury.

87.    In other words, notwithstanding his disability, Hamel was qualified for the position of corrections officer.

88.    Hamel returned to his position as corrections officer at OBCC on May 23, 2014.

89.    Also on May 23, 2014, the day Hamel returned to work, which was authorized by the DOC, Jones designated Hamel as chronic absent, her first opportunity to issue such designation since the February use of force because Hamel had been on medical leave.

90.    Jones labelled Hamel as chronic absent despite the fact that he utilized sick leave to treat the sarcoidosis and to recover from his knee injury, which occurred during a use of force.

91.    As a result of being classified as chronic absent, Hamel was subjected to the denial or revocation of employment benefits and privileges, including but not limited to assignment to a steady tour, assignment to a specified post or duties, access to voluntary overtime, promotions, secondary employment, assignment to specialized units or commands, amongst others.

92.    Hamel timely appealed the decision to labelling him chronic absent.  However, the DOC never decided his appeal, despite the fact that an injury from a use of force incident should be excluded.

93.     For two months between his return to work on May 23, 2014 to July 31, 2014, Hamel worked without incident, without utilizing any sick leave and performed his duties in an exemplary manner.

94.     On July 31, 2014, Hamel reported for work at OBCC for a regular tour of duty. Upon reporting he was handed a letter from Garland Toi Barreto, Acting Deputy Commissioner, which stated that his position as a probationary correction officer was terminated effective July 30, 2014, the previous day.

95.     There is no written delegation from Commissioner Ponte, which authorized Acting Deputy Commissioner Garland Toi Barreto to terminate Hamel's employment.  As a result, Hamel's termination is null and void and was done in contravention of DOC policy.

96.     Hamel later found out that he was allegedly terminated "…based on his submission of a false report of a use of force, coupled with an egregious attendance record since his appointment on May 16, 2013."

97.     Hamel's health insurance and other benefits ceased effective July 29, 2014, however Hamel was not notified that his benefits ceased until in or around August 10, 2014.

## CLAIMS FOR RELIEF

## AS AND FOR A FIRST CLAIM
*42 U.S.C. § 1983*
*First Amendment Retaliation against Defendant Captain Sledge*

98.     Hamel is protected by the First Amendment of the United States Constitution from having to be forced, directed or coerced by his supervisor, Captain Sledge to prepare and/or file a written report with a governmental agency or subdivision such as the DOC, which contained false, incomplete or misleading information.

99.     Hamel's refusal to file a false or misleading report was a motivating factor in the decision to terminate Hamel's employment as can be inferred by OBCC Warden, Kennneth Stukes recommendation for termination, citing Captain Sledge's false report that Hamel informed him that he injured his ankle running to the incident.

100.    In violation of DOC policy and procedure, Captain Sledge submitted a false statement concerning how Hamel was injured on February 17, 2014.  Sledge stated that Hamel told him that he injured his ankle running to the incident and not during a use of force.

101.    The false statement submitted by Captain Sledge concerning how Hamel was injured on February 17, 2014, caused Hamel to be labelled "chronic absent" by Deputy Warden Jones, and absenteeism was directly related to his termination.

102.    NYC believed the false statement submitted by Captain Sledge over the truthful statement submitted by Hamel.  Because of this OBCC Warden Kenneth Stukes recommended

that Hamel be terminated for "submission of a false report of a use of force, coupled with an egregious attendance record".   On February 17, 2014, Hamel prepared a truthful report stating that he was injured during a use of force, and which directly contradicted Captain Sledge's statement and written report.

103.    In the capacity as a probationary corrections officer Hamel had a moral and legal responsibility to ensure that all written reports filed with the DOC were truthful and accurate.

104.    Defendant Sledge threatened Hamel to falsify the report concerning the February 17, 2014 use of force incident.

105.    Had Hamel filed a false or intentionally misleading report would have constituted a crime under NYS penal law.

106.    A direct result of defendants retaliatory conduct, Hamel was caused to suffer shame, humiliation, loss of career, loss of financial benefits, loss of opportunity for career advancement as a corrections officer, and financial damages due to the loss of pay and benefits associated with the corrections officer position.

## AS AND FOR A SECOND CLAIM
### New York State Constitutional Violations against Defendant Captain Sledge

107.    Hamel's refusal to file a false or misleading report was a motivating factor in the decision to terminate Hamel's employment as can be inferred by OBCC Warden, Kennneth

Stukes recommendation for termination, citing Captain Sledge's false report that Hamel informed him that he injured his ankle running to the incident.

108.    In violation of DOC policy and procedure, Captain Sledge submitted a false statement concerning how Hamel was injured on February 17, 2014, Sledge stated that Hamel told him that he injured his ankle running to the incident and not during a use of force.

109.    The false statement submitted by Captain Sledge concerning how Hamel was injured on February 17, 2014, caused Hamel to be labelled "chronic absent" by Deputy Warden Jones, and was directly related to his termination.

110.    NYC believed the false statement submitted by Captain Sledge over the truthful statement submitted by Hamel. Because of this OBCC Warden Kenneth Stukes recommended that Hamel be terminated for "submission of a false report of a use of force, coupled with an egregious attendance record".

111.    The acts and omissions of Defendant Sledge as set forth above were undertaken under color of state law, ordinance, regulation, custom, or usage and operated to deprive Plaintiff of his constitutional right to free speech in violation of Article I, Section 8 of the Constitution of the State of New York. Defendants are jointly and severally liable in their individual and/or official capacity.

112.     The acts and omissions of the Defendant Sledge as set forth above were undertaken under color of state law, ordinance, regulation, custom, or usage and operated to deprive Hamel of his constitutional right to equal protection under the law and to be free of civil rights violations in violation of Article I, Section 11 of the Constitution of the State of New York.  Defendants are jointly and severally liable in their individual and/or official capacity.

113.     As a result of Defendants aforementioned conduct against Hamel, Hamel has suffered both economic and non-economic damages including mental anguish, public ridicule, public stigmatization and emotional distress.

## AS AND FOR A THIRD CLAIM
*Violations of the ADA, 42 U.S.C. § 12101*
*Disability Discrimination and Retaliation against Defendant NYC and Deputy Warden Jones*

114.     At all relevant times, Plaintiff had a disability or perceived disability – Sarcoidosis, Bronchiolitis obliterans with organizing pneumonia (BOOP), and a right knee meniscus tear.

115.     The Sarcoidosis, Bronchiolitis obliterans with organizing pneumonia (BOOP), limited Hamel's major life functions of breathing.

116.     The right knee meniscus tear limited Hamel's major life activities of walking, bending, lifting and sitting for long periods of time.

117.     NYC and Deputy Warden Jones were aware of Hamel's disabilities as shown by the the three medical reports submitted by Hamel to Defendants when he was hired as a

probationary corrections officer and the numerous evaluations by the DOC's Health Management Division.

118.    Jones issued Hamel three written warnings on separate occasions, verbal warnings and placed Hamel on "attendance counseling" despite the fact that Hamel utilized the sick leave to treat the sarcoidosis, and for being out due to the use of force injury.

119.    Jones classified Hamel as a "chronic absentee", despite the fact that Hamel utilized the sick leave to treat the sarcoidosis, and for being out due to the use of force injury.

120.    During his employment, Hamel utilized sick time to accommodate his disabilities. Instead, of engaging him in the interactive process, Defendants NYC and Jones, subjected Hamel to adverse employment action(s), including three written warnings, being labeled "chronic absentee" and termination of his employment in violation of the NYSHRL.

121.    As a result of Defendant and its agents discriminatory acts, Hamel has suffered and will continue to suffer substantial losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary damages and compensatory damages for, *inter alia*, inconvenience, mental anguish, emotional distress, humiliation, and loss of reputation.

## AS AND FOR A FOURTH CLAIM
*Violations of the NYSHRL*
*Disability Discrimination and Retaliation against Defendant NYC and Deputy Warden Jones*

122.    Plaintiff had a disability or perceived disability – Sarcoidosis, Bronchiolitis obliterans with organizing pneumonia (BOOP), and a right knee meniscus tear.

123.    The Sarcoidosis, Bronchiolitis obliterans with organizing pneumonia (BOOP), limited Hamel's major life functions of breathing.

124.    The right knee meniscus tear limited Hamel's major life activities of walking, bending, lifting and sitting for long periods of time.

125.    NYC and Deputy Warden Jones were aware of Hamel's disabilities as shown by the the three medical reports submitted by Hamel to Defendants when he was hired as a probationary corrections officer and the numerous evaluations by the DOC's Health Management Division.

126.    Jones issued Hamel three written warnings on separate occasions, verbal warnings and placed Hamel on "attendance counseling" despite the fact that Hamel utilized the sick leave to treat the sarcoidosis, and for being out due to the use of force injury.

127.    Jones classified Hamel as a "chronic absentee", despite the fact that Hamel utilized the sick leave to treat the sarcoidosis, and for being out due to the use of force injury.

128.    During his employment, Hamel utilized sick time to accommodate his disabilities. Instead, of engaging him in the interactive process, Defendants NYC and Jones, subjected Hamel to adverse employment action(s), including three written warnings, being labeled "chronic absentee" and termination of his employment in violation of the NYSHRL.

129.   Defendant Jones aided and abetted the discriminatory actions against Hamel as described above.

130.   As a result of Defendants discriminatory acts, Hamel has suffered and will continue to suffer substantial losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary damages and compensatory damages for, *inter alia*, inconvenience, mental anguish, emotional distress, humiliation, and loss of reputation.


### AS AND FOR A FIFTH CLAIM
*Violations of the NYCHRL*
*Disability Discrimination and Retaliation against Defendants NYC and Deputy Warden Jones*

131.   Plaintiff had a disability or perceived disability – Sarcoidosis, Bronchiolitis obliterans with organizing pneumonia (BOOP), and a right knee meniscus tear.


132.   The Sarcoidosis, Bronchiolitis obliterans with organizing pneumonia (BOOP), limited Hamel's major life functions of breathing.


133.   The right knee meniscus tear limited Hamel's major life activities of walking, bending, lifting and sitting for long periods of time.


134.   NYC and Deputy Warden Jones were aware of Hamel's disabilities as shown by the the three medical reports submitted by Hamel to Defendants when he was hired as a probationary corrections officer and the numerous evaluations by the DOC's Health Management Division.

135.    Jones issued Hamel three written warnings on separate occasions, verbal warnings and placed Hamel on "attendance counseling" despite the fact that Hamel utilized the sick leave to treat the sarcoidosis, and for being out due to the use of force injury.

136.    Jones classified Hamel as a "chronic absentee", despite the fact that Hamel utilized the sick leave to treat the sarcoidosis, and for being out due to the use of force injury.

137.    During his employment, Hamel utilized sick time to accommodate his disabilities. Instead, of engaging him in the interactive process, Defendants NYC and Jones, subjected Hamel to adverse employment action(s), including three written warnings, being labeled "chronic absentee" and termination of his employment in violation of the NYCHRL.

138.    Defendant Jones aided and abetted the discriminatory actions against Hamel as described above.

139.    As a result of Defendants discriminatory acts, Hamel has suffered and will continue to suffer substantial losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary damages and compensatory damages for, *inter alia*, inconvenience, mental anguish, emotional distress, humiliation, and loss of reputation.

### AS AND FOR AN SIXTH CLAIM
*(Violation of § 504 of The Rehabilitation Act of 1973 against Defendant NYC)*

140.    The DOC an agency of Defendant NYC has been recipients of public funds from the federal government.

24

141.    At all relevant times, Hamel had a disability – Sarcoidosis, Bronchiolitis obliterans with organizing pneumonia (BOOP), and a right knee meniscus tear.

142.    Hamel is a person with a disability within the meaning of 29 U.S.C. §794.

143.    Pursuant to the Rehabilitation Act of 1973. Defendant NYC has promulgated regulations, found at 49 CFR 27.1 et. seq., to implement the requirement that of the Act that recipient of federal funds not discriminate against individuals with disabilities.

144.    Jones issued Hamel three written warnings on separate occasions, verbal warnings and placed Hamel on "attendance counseling" in retaliation for utilizing sick days to treat his conditions.

145.    Jones classified Hamel as a "chronic absentee", and stripped the employment benefit of security in job benefits for in retaliation for utilizing sick days to treat the sarcoidosis, and for being out due to the use of force.

146.    Defendants subjected Hamel to the above mentioned adverse employment action(s), including termination, because he utilized sick days to treat his disabilities in violation of the § 504 of The Rehabilitation Act.

### AS AND FOR AN SEVENTH CLAIM
*(Violations of the NYC Charter §§621, 622, 815(f) and 1101;*
*and the Rules of the City of New York; 55 RCNY Appendix A Rule I;*
*§§ 2.1(c); 5.2.7(a) and (c), against Defendant NYC and Commissioner Ponte*

147.    Hamel's employment was terminated by Acting Deputy Commissioner, Garland Toi Barreto in violation of the statutory and regulatory provisions reserving the power of termination to Commissioner Ponte.

148.    Acting Deputy Commissioner Toi Barreto was not acting pursuant to lawful written designation or delegation of authority.

149.    As a result, the determination to terminate Hamel should be annulled and he should be reinstated with back pay.

### DEMAND FOR TRIAL BY JURY

150.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, where applicable, for all compensatory, emotional, physical, and punitive damages (where applicable), lost pay, front pay, loss of benefits, reinstatement, injunctive relief, and any other damages permitted by law.  It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled.

Dated:   Melville, New York
         February 2, 2016


FAMIGHETTI & WEINICK, PLLC
*Attorneys for Plaintiff*
155 Pinelawn Road, Suite 220S
Melville, New York 11747
(631) 352-0050


*Peter J. Famighetti*
PETER J. FAMIGHETTI


Cc:   Joseph D. Lockinger
      Assistant Corporation Counsel
      City of New York, Law Department
      Attorneys for Defendants
      (Via ECF)

27